## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| SOPHIA PHEAP, as Administratrix and Personal Representative of the ESTATE of CHANNARA PHEAP, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. _____ |
| CITY OF KNOXVILLE, Tennessee, a governmental entity; CHIEF EVE M. THOMAS, individually; DYLAN M. WILLIAMS, individually, and JOHN and JANE DOES 1-5, individually, | ) ) ) ) ) | Jury of Twelve Demanded |
| Defendants. | ) ) | |

---

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND WRONGFUL DEATH

---

Lance K. Baker, Esq.
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: (865) 200-4117
Fax: (865) 437-3370
Email: lance@lbakerlawfirm.com

Joshua D. Hedrick, Esq.
**WHITT, COOPER, HEDRICK & WOJCIK**
607 Market Street, Suite 1100
Knoxville, TN 37902
Tel: (865) 518-7073
Email: hedrick@knoxdefense.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I. NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B. Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV. FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A. The Hit and Run on Baxter Avenue . . . . . . . . . . . . . . . . . . . . . . . 14

    B. Officer Williams Searches for the Hit and Run Suspect and Vehicle
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C. Officer Williams Is Directed to the Third Floor and Encounters
Channara Pheap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D. Officer Williams Stops and Questions Mr. Pheap . . . . . . . . . . . . . . 17

    E. A Struggle Begins Between Officer Williams and Mr. Pheap . . . . . 18

    F. Mr. Pheap Breaks Free and Attempts to Run Away with Officer
Williams In Pursuit with a TASER . . . . . . . . . . . . . . . . . . . . . . . . . 20

    G. The Second Struggle: in the Parking Lot . . . . . . . . . . . . . . . . . . . . . 21

    H. Officer Williams Fires Two Shots at Mr. Pheap – Who Is Unarmed
and Running Away – Mortally Wounding Him in the Back . . . . . . . 23

    I. Chief Medical Examiner's Final Autopsy Report: "Gunshot Wound
of Back" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    J. Officer Williams' Private Statement . . . . . . . . . . . . . . . . . . . . . . . . 26

    K. KCSO and DA Allen's Exoneration of Officer Williams for Fatally
Shooting Mr. Pheap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

L.     Mr. Pheap Was Not an Imminent Serious Physical Threat to Officer Williams at the Time He Was Shot . . . . . . . . . . . . . . . . . . . . . 28

M.    Officer Williams Failed to Warn Mr. Pheap Before Firing Two Shots at Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

V.     WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

COUNT ONE – EXCESSIVE FORCE, VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §§ 1983 and 1988, Under Fourth and Fourteenth Amendments to the United States Constitution (Against Dylan M. Williams, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

COUNT TWO – FAILURE TO TRAIN AND SUPERVISE, VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §§ 1983 and 1988 (Against City and Chief Eve M. Thomas). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

COUNT THREE – WRONGFUL DEATH, TENN. CODE ANN. §§ 20-5-106 et seq. (Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

COUNT FOUR – BATTERY (Against Officer Williams). . . . . . . . . . . . . . . 45

COUNT FIVE – NEGLIGENCE (Against All Defendants). . . . . . . . . . . . . 46

VII.   JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VIII.  PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**COMES** Sophia Pheap, as Administratrix and Personal Representative of the Estate of Channara Pheap ("Plaintiff"), and files this Complaint against the City of Knoxville, Tennessee, a governmental entity (the "City"), Chief Eve M. Thomas, individually ("Chief Thomas"), Dylan M. Williams, individually ("Officer Williams"), and John and Jane Does 1-5, individually ("Doe Defendants") (collectively, "Defendants").

## I. NATURE OF ACTION

*"This 33-year old man, Channara T. Pheap, died of gunshot wound of back."*[1]

1.      This civil rights and state tort action arises out of the wrongful death of Channara Tom "Philly" Pheap ("Mr. Pheap") – a 33-year old father of a five-year old daughter – in connection with the fatal police shooting by Knoxville Police Department ("KPD") Officer Dylan M. Williams ("Officer Williams") at 5:39 p.m. on August 26, 2019 in a parking lot of an apartment complex.

2.      On August 26, 2019, at approximately 5:35 p.m., Officer Williams was investigating a hit and run that had occurred moments earlier on Baxter Avenue in Knoxville. Given the license plate number of the suspect hit and run vehicle – a gold Dodge Neon – Officer Williams tracked its registered owner to an address at Clear Springs Apartments in northwest Knoxville and made his way to that location. Spotting a vehicle matching the description of the suspect hit and run vehicle parked

---

[1] *See* Final Autopsy Report of Channara T. Pheap, Aug. 31, 2019, Knox County Medical Examiner.

in one of the parking lots of the apartment complex, Officer Williams pulled in behind

that vehicle and exited his cruiser, with dash-cam and audio enabled, leaving his K-9

(Nash) behind in the back seat, to locate the driver.

3.     On the cruiser-video, ground floor residents are seen directing Officer

Williams upstairs, telling him he would need to go around to the back of the building

to get upstairs. Officer Williams walked around the corner of the apartment building.

At this point, although no video[2] of the next few moments exists, Officer Williams

encountered Mr. Pheap coming down the stairs and started to question him.

4.     At that moment, Mr. Pheap was merely a suspect in a misdemeanor hit

and run offense. He was not "under arrest." Because he had checked the Tennessee

Criminal Justice Portal, Officer Williams knew that the registered owner of the gold

Dodge Neon was a female who resided at Clear Springs Apartments. And although he

was informed via radio right after he encountered Mr. Pheap that the hit and run

---

[2]Although the KPD implemented in-car audio/video recording in or about
1998, as of August 26, 2019, the department did not equip its officers with body-
worn cameras. In contrast, Knox County Sheriff's Office deputies are equipped with
both body and dash cameras. Calls to equip KPD officers with body-cams mounted
after a series of fatal shootings by local police, including Officer Williams killing of
Mr. Pheap. While dash-cam footage from Officer Williams' cruiser showed the two
men fighting, the shooting itself was not caught on video. For months, investigating
authorities declined to release key details about the shooting, leading activists to
call for increased transparency and body-cams. Finally, in September 2019,
Knoxville's City Council requested that KPD explore the possibility of purchasing
body-cams. The department took bids for supplying the devices in January 2020. In
July 2020, City Council approved a contract with Axon Enterprises to purchase
body-cams for KPD officers. The City is expected to deploy the devices as early as
Fall 2020.

suspect was a "light or medium-skinned Black male or a Hispanic,"[3] Mr. Pheap was actually neither Black nor Hispanic.

5.     Nor did Mr. Pheap appear to pose an immediate threat to Officer Williams' safety. Nevertheless, the cruiser-audio indicates that amidst his questioning of Mr. Pheap, Officer Williams decided to conduct a "*Terry v. Ohio*"[4] pat-down to check Mr. Pheap for weapons.[5] Mr. Pheap turned around, his back facing Officer Williams, as Officer Williams had commanded. For reasons that will never be fully known, a

---

[3]The driver who reported the hit and run and followed the suspect vehicle actually described the suspect to the 911 operator as follows: "I want to say he's a Mexican or mixed. I'm not sure."

[4]*Terry v. Ohio*, 392 U.S. 1 (1968), was a landmark decision of the United States Supreme Court in which the Court ruled that the Fourth Amendment's prohibition on unreasonable searches and seizures is not violated when a police officer stops a suspect on the street and frisks him without probable cause to arrest, if the police officer has a reasonable suspicion that the person has committed, is committing, or is about to commit a crime and has a reasonable belief that the person "may be armed and presently dangerous." For their own protection, after a person has been stopped, police may therefore perform a quick surface-search of the person's outer clothing for weapons if they have reasonable suspicion that the person is armed. This reasonable suspicion, however, must be based on "specific and articulable facts" and not merely upon a hunch. This permitted action has been referred to as a "stop and frisk" or simply a "*Terry* frisk."

[5]Officer Williams justified the pat-down in a post-shooting statement to investigators by claiming Mr. Pheap kept putting his hands in his pockets and that he noticed a "bulge" in one of Mr. Pheap's pockets. However, no weapon of any sort was found on Mr. Pheap's body after the shooting. Nor was any weapon located at the crime scene. Nor was any item found on Mr. Pheap or at the crime-scene that could have been mistaken for a weapon or produced a "bulge" in Mr. Pheap's pocket.

-3-

struggle ensued. According to Officer Williams – whose account, unfortunately, is the only one left – after he asked Mr. Pheap if he could check to see if he had keys in his pocket, Mr. Pheap tried to run away.[6]

6. From this point until moments later, when Mr. Pheap lay dead in the parking lot of a gunshot wound to the back, Officer Williams' lack of training unnecessarily escalated a routine situation into fatal one. First, Officer Williams attempted to stop Mr. Pheap from getting away from him by unsuccessfully using a leg-sweep on him. Then, Officer Williams grabbed Mr. Pheap around the waist from behind, more or less placing him in a bear-hug. All of this, however, was unnecessary. Mr. Pheap was on-foot, and even if he was the suspected hit and run driver, the vehicle he was driving – the gold Dodge Neon – was blocked-in by Officer Williams' Tahoe. Mr. Pheap was not going anywhere. And Officer Williams knew very well that the

---

[6]Following Mr. Pheap's death, Officer Williams conjured up various notions of Mr. Pheap's purported actions in an effort to reflect that Mr. Pheap was a "threat" to him at this juncture. For example, Officer Williams told investigators: "from the moment I saw him walking down the stairs to the moment that he started to run he was looking around as if planning a possible escape route." And, referring to an alleged "bulge" in Mr. Pheap's pocket, Officer Williams said he thought 'it could be a weapon." Also, Officer Williams recalled, "Big red flags were going off." Yet, there is no evidence that Officer Williams's post-incident statements about his safety being threatened at this point had any basis in fact. Simply put, Mr. Pheap was a 5'10½" 157-pound unarmed man. Officer Williams was a well-armed police officer. What's more, if Officer Williams considered Mr. Pheap a threat at this stage, why did he not call for back-up? Why did he not use de-escalation skills that he was supposedly trained to employ in such cases by KPD? Why did he not use other force-options on the KPD's force-continuum to insure his safety? The obvious reason is that at this point, he did not at all believe Mr. Pheap was a threat. Worse, he did not utilize de-escalation skills or proceed along the KPD's force-continuum because he had never received the proper training to allow him to do so.

registered owner of the Dodge Neon resided at Clear Springs Apartments. In other words, if he was the hit and run driver, Mr. Pheap was undoubtedly a marked man.

7.     There was no legitimate reason to escalate the situation into one involving force, much less deadly force. Officer Williams could have allowed Mr Pheap to reach an optimal distance (15-25 feet), then deployed his TASER. He could have used his baton. He could have used pepper-spray. He could have let Mr. Pheap go, radioed for back-up, and got his K-9 out of the Tahoe to pursue Mr. Pheap. In other words, Officer Williams had a variety of non-deadly alternatives, and if he had only been trained sufficiently to consider them, he would not have shot and killed Mr. Pheap just a few moments later.

8.     Instead, Officer Williams created a dangerous situation by initiating force against Mr. Pheap. Officer Williams turned what was an information-gathering encounter into a physical confrontation, doing so with neither back-up or his K-9. The two men, each struggling to get the upper hand, slid together down the muddy hill between apartment buildings to the parking lot.

9.     At that point, Officer Williams' cruiser-video shows Mr. Pheap breaking free and started to run away (again), toward the parking lot. In response, Officer Williams drew his KPD-issued TASER and warned the fleeing Mr. Pheap twice that he was going to tase him. Mr. Pheap stopped, turned around to face Officer Williams, and raised his hands. From there, accounts of what happened next vary.

10.    There is audio – but no video – of the next moments. Mr. Pheap is not around to talk about it. But whether Officer Williams tased Mr. Pheap, which is what

-5-

at least one witness said happened, or whether Mr. Pheap actually took Officer Williams' TASER away from him and fired it in Officer Williams' direction, which is what Officer Williams and other witnesses say happened, or whether the TASER was triggered accidentally by either man in the struggle – the TASER pulse-log shows it was fired at such a close range that any shock was largely ineffective (it released only 2,000 volts).[7] Officer Williams claims that Mr. Pheap tried to tase him or that he was tased, but he also stated that he was "fine" after supposedly being tased. Whatever happened, Mr. Pheap started to run away again.

11.     According to at least one witness, Mr. Pheap dropped the TASER and ran about four parking spaces away from Officer Williams – as much as forty (40) feet – when, according to multiple witnesses, as the unarmed Mr. Pheap was still running away, with his back to Officer Williams, Officer Williams drew his .45 Sig Sauer handgun and, without warning, fired two rounds at Mr. Pheap, hitting him once in the back. Mr. Pheap died at the scene.[8]

12.     After the shooting, Officer Williams claimed – and the Knox County Sheriff's Office ("KCSO") and Knox County Attorney General Charme Allen ("DA

_____

[7]Under optimal conditions and deployment, the TASER X26P shoots out 2 darts attached to 25 feet of wire carrying 50,000 volts. By comparison, static electrical charges of 25,000 volts are not uncommon from door knobs, filing cabinets, or other metal objects.

[8]Knox County Chief Medical Examiner, Dr. Darinka Mileusnic, stated that the bullet entered slightly from back to front and slightly downward, entering next to the scapula, involving the left chest, the upper lobe of the left lung, and perforating the aorta. Mr. Pheap died of exsanguination.

Allen") found – that the shooting of Mr. Pheap was a justifiable homicide because Officer Williams purportedly "had probable cause and a reasonable belief" that Mr. Pheap "posed a threat of imminent death or serious bodily injury," as Officer Williams "was engaged in a violent altercation with Pheap."[9]

13.     Yet, at the moment Officer Williams fired the two shots at Mr. Pheap and killed him, the altercation between the two men had ended: they were separated by approximately 40 feet, by one witness-account, with Mr. Pheap unarmed and running away from Officer Williams. Mr. Pheap thus posed no imminent threat of danger to Officer Williams at the time Officer Williams shot him. Accordingly, Officer Williams' use of deadly force can hardly be reasonable under these circumstances.

14.     What is more, even if Mr. Pheap had the TASER at any point, by the time Officer Williams fired the two shots at him, Mr. Pheap had dropped it. After all, the wires to the Axon X26P TASER were only 25-feet long. According to Officer Williams, one of its two darts was stuck in his utility belt. At such a distance, Mr. Pheap could not have been holding the TASER, as he was well beyond the wires' length. In truth, he was simply trying to get away.

---

[9]Historically, a policy existed for KPD to investigate any KCSO officer-involved shooting and the KCSO to investigate any KPD officer-involved shooting. Thus, pursuant to a Memorandum of Understanding for Officer Involved Shootings, the lead investigative agency in this case was the KCSO. In April 2020, DA Allen requested the Tennessee Bureau of Investigation ("TBI") to conduct all officer-involved shootings investigations related to Knox County and Knoxville law enforcement agencies.

15. Officer Williams, the KCSO, and DA Allen also claim that Officer Williams had no alternative but to use deadly force under the circumstances. Yet, the actual circumstances presented Officer Williams with a variety of alternatives to fatally shooting a fleeing and unarmed Mr. Pheap: he could have utilized his Oleoresin Capsicum (OC) Spray (pepper-based spray); or, pursued Mr. Pheap with his baton; also, Officer Williams' K-9,Nash, was just a few feet away in the back of his Tahoe, and he could have let the K-9 out to pursue Mr. Pheap, who was on-foot;[10] or, he could have radioed for back-up to pursue Mr. Pheap, who was not likely to get very far without being apprehended; or, he could have let Mr. Pheap go for the time being so as not to let the situation escalate, and questioned the driver of the Dodge Neon, whose identity and address he knew at this point: she resided at Clear Springs Apartments.

16. From his initial contact with Mr. Pheap, Officer Williams' actions and his lack of proper training from the KPD unnecessarily and unreasonably escalated a placid situation – the routine questioning of a possible misdemeanor offense suspect – first into a situation of non-lethal force (using a leg-sweep and tackling Mr. Pheap to keep him from getting away), then into a situation of less-lethal force (pulling his TASER), and finally, into a situation of deadly force, firing two rounds to fatally wound a fleeing and unarmed Mr. Pheap from approximately 40 feet away.

---

[10]Just four months earlier, on April 6, 2019, Officer Williams had deployed Nash to apprehend two armed carjacking suspects who, like Mr. Pheap, had fled on foot. The suspects were tracked several blocks and one immediately surrendered. The second suspect attempted to continue his flight, but Officer Williams released Nash, who pursued and bit the fleeing suspect, causing him to go to the ground and be taken into custody without further incident.

17.    Despite repeated opportunities, Officer Williams failed to bring Mr. Pheap into control by using non-deadly force: he failed to use his baton to get control of Mr. Pheap; he failed to use pepper-spray; he apparently failed to use his TASER as he chased Mr. Pheap into the parking lot; and he failed to utilize Nash, his K-9, to control Mr. Pheap.[11]

18.    Mr. Pheap was running away and unarmed and did not pose an immediate threat of death or serious bodily injury to Officer Williams at the time hie drew his handgun and fired. A reasonable, trained, skilled, or proficient officer in Officer Williams' circumstances could not have believed that using deadly force in shooting Mr. Pheap was necessary in the situation at hand, or that it was measured or patterned for the circumstances presented.

19.    Among other rights possessed by Mr. Pheap, "[i]t has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" *Ciminillo v. Streicher*, 434 F.3d 461, 465-66 (6th Cir. 2006).

20.    The unconstitutional consequences of failing to train and supervise KPD officers in the reasonable and justifiable use of force, including less-lethal and deadly force, are so patently obvious that the City and Chief Eve M. Thomas are liable under § 1983.

---

[11]Following the shooting, Officer Williams said that he had been too far away from his Tahoe to call Nash to stop Mr. Pheap, and was "left with no other choice" than to shoot Mr. Pheap.

-9-

21.     Defendants, acting under color of law, deprived Mr. Pheap of his constitutional rights under the Fourth Amendment and caused his wrongful death. By this action, brought under 42 U.S.C. § 1983 and Tennessee law, Plaintiff makes the following claims:

- Count One – 42 U.S.C. § 1983 – excessive use-of-force by Officer Williams against Mr. Pheap under the Fourth and Fourteenth Amendments;

- Count Two – 42 U.S.C. § 1983 – failure of the City, KPD, and Chief of Police Eve M. Thomas to properly train and supervise officers with respect to the use of force, including deadly force;

- Count Three – wrongful death of Mr. Pheap;

- Count Four – battery on Mr. Pheap; and

- Count Five – negligence in causing Mr. Pheap's death.

22.     Plaintiff seeks all compensatory damages available under the law, including, but not limited to damages for (a) excruciating physical pain and suffering before Mr. Pheap's death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before Mr. Pheap's death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of the 33-year old Mr. Pheap's life if the death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of Mr. Pheap's life if the death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Mr. Pheap's Estate, through Plaintiff; and (f) loss of society and companionship for Mr. Pheap's minor daughter. Plaintiff

-10-

further requests punitive damages against Officer Williams, individually, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

23.     This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution, and for violations of related state law torts. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

24.     This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

25.     Venue of this action is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Knox County, within the Northern Division of the Eastern District of Tennessee.

## III. PARTIES

### A. Plaintiff

26.     Sophia Pheap, the lawful and duly appointed Administratrix and Personal Representative of the Estate of Channara Pheap ("Plaintiff"), is also the sister of the decedent, Channara Pheap ("Mr. Pheap" or "Decedent"). Plaintiff was appointed Administratrix of Mr. Pheap's Estate (the "Estate") by the Probate Division of the

Chancery Court for Knox County, Tennessee by order on June 26, 2020. During all relevant times, Plaintiff was a citizen and resident of Rhode Island. Mr. Pheap, Decedent, was a citizen and resident of Knox County, Tennessee.

**B. Defendants**

27. Defendant, the City of Knoxville (the "City") is a governmental entity and political subdivision of the State of Tennessee, duly organized. It may be served through its chief executive officer, Mayor Indya Kincannon, at 400 Main St., Room 691, Knoxville, TN 37902. The City possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual members of the Knoxville Police Department ("KPD"), and to assure that actions, policies, rules, regulations, practices and procedures of the KPD and its employees comply with the laws and constitutions of the United States and Tennessee.

28. The City and KPD are responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

29. At all relevant times, Chief Eve M. Thomas was the duly-appointed Chief of Police for the City of Knoxville, responsible for the screening, hiring, firing, training and the supervision of KPD officers. Chief Thomas is sued in her individual capacity and as principal on, if any, her official bond. At all relevant times, Chief Thomas was

-12-

operating under color of law. Chief Thomas is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knoxville Police Department, 800 Howard Baker Jr. Ave., Knoxville, TN 37915.

30. The KPD has approximately 383 sworn officers. The KPD had five officer-involved shootings within a year of the incident that is the subject of this action, including four fatalities. The KPD has had at least eighteen (18) officer-involved shooting fatalities in twenty years.

31. At all relevant times, Defendant, Dylan M. Williams ("Officer Williams"), was employed by the KPD as a patrol officer. Officer Williams is sued in his individual capacity and as principal on, if any, his official bond. At all relevant times, Officer Williams was operating under color of law. Officer Williams is, upon information and belief, a citizen and resident of Knox County and may be served with process at the Knoxville Police Department, 800 Howard Baker Jr. Ave., Knoxville, TN 37915.

32. Plaintiff also sues the fictitious Defendants, Does 1-5, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are also sued in their individual capacities as KPD officers and as principals on, if any, their official bonds.[12]

33. Various persons not made Defendants herein, including, but not limited to, City or KPD officials, have participated with Defendants in the violations asserted

---

[12]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff will seek leave of this Court to amend her Complaint to set forth the true names and capacities of such Defendants when their identities are ascertained.

herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as Defendants at a later date.

## IV.   FACTUAL ALLEGATIONS[13]

### A.    The Hit and Run on Baxter Avenue

34.    On August 26, 2019, at about 5:19 p.m., a woman and her granddaughter were driving a 2015 Toyota Highlander SUV southbound on Elm Street crossing Baxter Avenue in Knoxville, Tennessee. They collided with a gold sedan. The gold sedan – which had apparently been traveling eastbound along Baxter Avenue – inexplicably allegedly fled the scene.

35.    A passing motorist followed the gold sedan and called 911 to report the accident. When asked for a description of the gold sedan's driver, the motorist said, "I want to say he's a Mexican or mixed. I'm not sure." The motorist got close enough to the gold sedan to see and then relay the license plate number to the 911 dispatcher.

---

[13]The allegations set forth herein are derived from multiple sources, including, but not limited to, private investigator-interviews with multiple witnesses, witness-video(s), preliminary and final autopsy reports from the Knox County Medical Examiner's Office, recordings from Officer Williams' in-cruiser video/audio system relative to the incident, hundreds of crime-scene photographs, numerous audio-files, multiple hand-drawn diagrams, witness-interview transcripts or statements, a transcript of Officer Williams's official internal affairs interview, interview-transcripts from interviews of other KPD officers, forensic chemistry and biology reports of the TBI, Officer Williams' TASER event log, and other forensic evidence produced by the KCSO. Counsel also visited the scene of the incident, reviewed Officer Williams' public statement, conducted interviews of several members of Mr. Pheap's family and various friends, reviewed records relative to Mr. Pheap's limited criminal history, reviewed numerous communications between Mr. Pheap's counsel and the DA Allen's office, reviewed numerous print, broadcast, and social media reports and pages, and reviewed a lengthy video presentation by DA Allen (exonerating Officer Williams from criminal culpability).

-14-

36.     KPD officers began to investigate the hit and run as a violation of Tenn. Code Ann. § 55-10-102, Leaving the Scene of an Accident, a misdemeanor.

**B.     Officer Williams Searches for the Hit and Run Suspect and Vehicle.**

37.     On August 26, 2019, Officer Dylan M. Williams[14] started his shift as "79 Charlie" at 3:00 p.m. His assignment was to be a "wild car" – driving his KPD-issued 2014 Tahoe as the West District K-9 officer. The vehicle was equipped with a dash-camera/audio recording system.

38.     Officer Williams was driving in the Western Avenue-Mechanicsville area in Northwest Knoxville when he heard a call about the hit and run incident on Baxter Avenue. Officer Williams ran the plate in the Tennessee Criminal Justice Portal and retrieved the information: a 2001 Dodge Neon registered to Jessica Beverwyk at 1716 Merchants Drive. Officer Williams knew this was the address for Clear Springs Apartments (formerly Tillery Ridge Apartments) and made his way there.

39.     Officer Williams turned off of Merchants Drive into the apartment complex, at which time his cruiser audio/video system activated. He spotted a gold Dodge Neon in the first parking lot and pulled into that lot. He confirmed the license plate on the vehicle and pulled behind the gold Dodge Neon at an angle, to block it in.

---

[14]Officer Williams was hired in January 2014. By August 2019, he had been assigned to the K-9 Unit for the West Charlie Squad afternoon shift for the three years.

-15-

**C.    Officer Williams Is Directed to the Third Floor and Encounters Channara Pheap.**

40.     Officer Williams exited his Tahoe and, leaving Nash, his K-9, in the back, walked over to a nearby apartment. He asked the occupants if they knew where he could locate the owner of the vehicle. From the cruiser-video, one of the residents can be seen pointing upstairs toward the third floor of the apartment building.

41.     To access the third floor of the apartment building, Officer Williams was directed by a resident to go around the corner to the right of the building and up a hill between two apartment buildings. He is seen on the cruiser-video walking to the right, going around the corner of the building, and heading up a muddy hill.

42.     According to Officer Williams' cruiser-audio, at 5:35:53 p.m., as he was making his way towards the stairs to the third floor, he encountered a man who turned out to be Channara Tom "Philly" Pheap ("Mr. Pheap")[15] coming down the stairs. According to Officer Williams,[16] Mr. Pheap looked "fidgety" and "very nervous."

_____

[15]Mr. Pheap was the father of a five-year old daughter and was also helping to raise his girlfriend's two young sons. He resided in Knoxville and worked for a local moving company through a temporary employment agency. Mr. Pheap's local criminal history included a 2015 conviction for misdemeanor evading arrest. This incident occurred when a KPD officer tried to pull him over for having a cracked windshield and Mr. Pheap sped away. He told officers he drove away because he thought his license was suspended. By the time of his death, Mr. Pheap's friends reported that he had put a troubled past behind him. He was the fourth of nine siblings and grew up in Philadelphia, Pennsylvania. His siblings reported that he was "the backbone" of the family," kept "everyone connected," and served as the family's "mediator."

[16]Of course, police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. For this reason, hindsight is

-16-

43.     Notably, at this point, Officer Williams had not been given a description of the hit and run suspect. He did know, however, that the registered owner of the gold Dodge Neon was female, as noted. No explanation has been provided as to why, at this moment, Officer Williams suspected that Mr. Pheap had committed a crime, particularly the hit and run. After all, by logic, he should have initially been looking for a woman, *i.e.*, Miss Beverwyk.

**D.     Officer Williams Stops and Questions Mr. Pheap**

44.     On muffled audio from the cruiser-recording, Officer Williams can be heard questioning Mr. Pheap. At that point, he radioed for a description of the driver of the suspected hit and run vehicle. Over the radio, Officer Williams heard the following description: "light to medium skin, black male or Hispanic." Officer Williams is then heard saying to Mr. Pheap,[17] "well, what do you know," indicating his belief that he "had his man."[18] Yet, Mr. Pheap was neither "a light or medium-skinned Black male" nor was he Hispanic.

---

usually not a reliable tool in assessing the reasonableness of an officer's actions. Unfortunately, Mr. Pheap is dead, unable to contradict Officer Williams' own version of the events. Therefore, what may very well be a self-serving account of the incident by Officer Williams should be viewed with circumspection, if not skepticism.

[17]While the 2001 Dodge Neon was registered in her name, Miss Beverwyk, the mother of Mr. Pheap's 5-year old daughter, told officers that she allowed Mr. Pheap to use the car and that he had taken over making payments on it.

[18]Following the shooting, Officer Williams stated, "when he said light skin black male or Hispanic male that immediately put like – this has to be my suspect."

45.     Next, Officer Williams asked Mr. Pheap if he had his keys on him and instructed him to keep his hands out of his pockets. Later, after Officer Williams had time to reflect and be debriefed, he offered that he had been concerned about a "bulge" in Mr. Pheap's pocket, stating that he thought it might have been a weapon.[19] And so, Officer Williams opted to conduct a *Terry v. Ohio* pat-down for weapons and asked Mr. Pheap for consent to search his pockets for the keys to the Dodge Neon. On the cruiser-audio recording, Officer Williams then asked Mr. Pheap to turn around, adding, "Do you care if I check real quick?"

### E.     A Struggle Begins Between Officer Williams and Mr. Pheap

46.     Officer Williams later recounted that he was afraid Mr. Pheap had a weapon, that he thought Mr. Pheap was going to try to escape, and that "[b]ig red flags were going off." Still, if he had truly believed Mr. Pheap to be an imminent threat to his safety, Officer Williams took no form of action to allay such fear.

47.     At 5:36:59 p.m., audio from Officer Williams' cruiser-recording system indicates the beginning of a struggle between the two men. Later, Officer Williams told investigators that when he started the pat-down, Mr. Pheap, who had his back to him, "stepped directly away from me and I could tell that at that point he knew it was up and he was gonna try to get away." Mr. Pheap "started to try to run forward."

---

[19]It was subsequently determined that Mr. Pheap did not possess a weapon, nor did he possess anything in his pockets that could have created the so-called "bulge" which Officer Williams said justified a *Terry* pat-down.

-18-

48.     Officer Williams did not know if Mr. Pheap was the hit and run suspect. Mr. Pheap was certainly not "under arrest." Rather, Mr. Pheap, according to Officer Williams, was merely trying to run. In other words, he was not a danger to Officer Williams (or to others). Besides, if Mr. Pheap was indeed the hit and run suspect Officer Williams was looking for, he was fleeing on-foot, the Dodge Neon was blocked-in by Officer Williams' Tahoe, and Mr. Pheap's identity was obviously known by the Dodge Neon's registered owner who happened to reside at the complex. Although Officer Williams could have radioed for back-up, deployed his TASER right then, used his baton, used pepper spray, or even utilized Nash, his K-9 partner, to pursue Mr. Pheap. He opted to do none of these things.

49.     Instead, according to Officer Williams, he unsuccessfully attempted a leg-sweep maneuver to gain control of Mr. Pheap,[20] ultimately grabbing Mr. Pheap "around the waist," as Mr. Pheap tried to pull away,[21] and essentially tried to tackle him.

50.     None of this portion of the encounter appears on the cruiser-video, as the men were still out of view of the cruiser camera, around the corner, up the hill, and behind the apartment building.[22] However, the men suddenly came into view on the cruiser-video, struggling on the ground as they slid down the muddy hill between

_____

[20]Mr. Pheap was 5' 10½" and weighed 157 pounds.

[21]Following the shooting, Officer Williams stated that "at that point, uh, the next thing he did was he realized what was up and he starts to step forward and run forward so I grab him, uh, from behind, uh, basically around the waist, the stomach, in kind of a bear hug, so his back's against my chest."

[22]In August 2019, KPD officers did not wear body cameras.

apartment buildings. Officer Williams is first seen in the video on the back of Mr. Pheap, whose hands and knees are on the ground. Mr. Pheap rose up, lifted Officer Williams off the ground, and was able to get on top of the officer.

### F.   Mr. Pheap Breaks Free and Attempts to Run Away with Officer Williams In Pursuit with a TASER.

51.     On the cruiser-video, the struggle continued toward the parking lot, close to Officer Williams' Tahoe. As the men neared the parking lot, Mr. Pheap broke free and began to run away off-camera, to the right of Officer Williams' Tahoe.

52.     It is at this point that Officer Williams later says that he pulled his TASER.[23] He is heard yelling "stop," then, at 5:37:34 p.m. on the cruiser-audio recording, he said, "I'm gonna tase you, I'm gonna tase you." At this point, according to Officer Williams and witnesses, Mr. Pheap stopped running, turned around to face Officer Williams, and raised his hands.[24]

---

[23]The TASER was first developed in the mid-1970s by American inventor Jack Cover. TASER is an acronym for Tom A. Swift Electric Rifle (the Tom Swift books about an inventor of amazing gadgets were a childhood favorite of Cover) and is a brand-name for the device, which is manufactured by AXON (formerly TASER Int'l). During the 1990s, the TASER was introduced to law enforcement as an alternative to deadly force. It became a non-lethal alternative to the use of deadly force where the baton was insufficient to control persons. As of 2020, about 94% of the country's roughly 18,000 police agencies now issue TASERs.

[24]According to his post-shooting statement to investigators, Officer Williams stated, "at that point I stop running and I had my TASER out-stretched with one arm and I start walking, just closing the distance, walking towards him to get a little closer. And I say, twice I say 'Get on the ground, get on the ground!' And he says, 'Ok.' I believe."

-20-

53. Officer Williams commanded Mr. Pheap to "get down on the fucking ground, on the fucking ground," as he continued to close the distance to within a few feet of Mr. Pheap. By then, a handful of bystanders were observing the men.

**G.    The Second Struggle: in the Parking Lot.**

54. Then, according to Officer Williams post-shooting statement to investigators, Mr. Pheap "lunges out and he grabs my TASER with both hands."[25] Officer Williams later said that he heard "the pop of the TASER" and felt the probes. Photographs taken after the shooting show that at least one TASER probe struck Officer Williams' utility belt, the wires wrapped around his arms. Still, Officer Williams later said that he was "fine," that he "felt something a little bit" when he was initially tased, but that Mr. Pheap "must not have gotten a good taser hit." He didn't have to fight through it. "I feel ok, I am fine," he said.[26]

---

[25]There is no indication why Officer Williams did not deploy his TASER when he was warning Mr. Pheap that he was going to do so.

[26]The effects of being tased may only be localized pain or strong involuntary long muscle contractions, based on the mode of use and connectivity of the darts. AXON, the maker of the TASER used by KPD, suggests various causes for a TASER deployment's limited effectiveness:

- miss or single dart hit
- close probe spread
- incomplete, broken, or intermittent circuit
- loose or thick clothing
- low nerve or muscle mass
- obese subject
- wires break, touch each other, or fall on a conductive surface
- operator error

-21-

55.     Nothing on the cruiser-video or audio confirms that Mr. Pheap actually tased Officer Williams.[27] Although the TASER pulse-log did indicate that the TASER had been fired during the incident,[28] investigators were unable to synchronize the time-stamp from the TASER pulse-log with the time-stamp from the cruiser-video.[29] It is also entirely possible that Officer Williams accidentally tased himself during the struggle, which would also explain the ineffectiveness of the TASER.[30]

---

[27]While a few witness statements and Officer Williams' own post-incident statements suggest Mr. Pheap took his TASER away from him and attempted to use it on him, Mr. Pheap, who presumably lacked any TASER-training, either failed to deploy the weapon properly, fired it at a range too close to be effective, or it simply misfired, as the pulse-log graph for Officer Williams' TASER registered a 2,000 volt shock and Officer Williams was by no means incapacitated from it. High voltage, in itself, is not dangerous. After all, one can receive a 25,000-volt shock of static electricity from a door-knob on a dry day without harm.

[28]Plaintiff disputes that Mr. Pheap actually took the TASER away from Officer Williams, that Mr. Pheap actually pulled the trigger of the TASER or knew how to use it, and that Mr. Pheap intended to target Officer Williams with the TASER. However, however the TASER was triggered, it appears to have been fired at too close of a range to work effectively.

[29]Officer Williams received training on TASERs at the KPD Training Academy and at subsequent in-service training. The extent of neuromuscular incapacitation depends on several factors, including the spread of the probes and the strength of contact of the probes. Officer Williams received this information when he was trained on the use of a TASER.

[30]From a practical perspective, one needs to be within a relative mid-range, as far as 15-25 feet, in order to use a TASER. If a subject is too close, then a TASER would not be effective. Notably, there has been no positive indication by Officer Williams, witnesses, or other evidence to show just how far away Mr. Pheap was from Officer Williams when the TASER was allegedly triggered. One witness, in a ground floor apartment (Apt. No. 1002), told investigators that the men were about "three feet away" when the TASER was fired, but the same witness also stated that *it was Officer Williams who tased Mr. Pheap* from that distance.

-22-

**H. Officer Williams Fires Two Shots at Mr. Pheap – Who Is Unarmed and Running Away – Mortally Wounding Him in the Back.**

56. In any event, Officer Williams claimed that after he heard the "pop of the TASER," he was thinking, "I know what I have to do and I'm thinking I have to do it as humanly fast as possible."[31]

57. Although at least one witness, Ms. April Bernard, told investigators that Mr. Pheap had dropped the TASER by this point (before she heard gun shots), Officer Williams drew his handgun: "As I'm drawing I see him. I see his face looking at me, I see his eyes and I fire two rounds at him," explaining that he fatally shot Mr. Pheap largely because he feared Mr. Pheap would use the TASER on him.

58. According to the cruiser-audio, two "pops" are heard at 5:37:53 p.m., corresponding to Officer Williams firing two rounds at the fleeing Mr. Pheap. One of the rounds struck Mr. Pheap in the back,[32] mortally wounding him. Mr. Pheap

_____

[31]In his post-shooting statement to investigators, Officer Williams lists a litany of thoughts that purportedly ran through his mind as Mr. Pheap started to run away, *e.g.*, "this is it," "I have to come up and I have to end this threat as soon as I can because one split second and he could either be on top of me and over power me or he could pull that trigger again and . . . pull the Taser again and it only take that much," "I got scared for my life because I know that this – I know what this taser can do. I know it's an incapacitating weapon and that if he gets control of this, he has the ability to possibly incapacitate me completely; take my gun; shoot me; choke me to death; whatever he wants to do," "I thought he was gonna kill me," "he's gonna be able to take my gun and shoot me," "I'm gonna die and thinking about my wife and one year old son . . . that I'm never gonna see again."

[32]At a press conference by DA Allen in November 2019, Chief Medical Examiner, Dr. Darinka Mileusnic, confirmed the cause and manner of Mr. Pheap's death was a "gunshot to the back" of "indeterminate range."

-23-

continued to try to get away, running around the corner of a dumpster.[33] Officer Williams pursued him, repeatedly ordering the dying man to "stop." Mr. Pheap "ultimately collapsed" on the other side of the dumpster.[34] Officer Williams radioed, "Shots fired; suspect down," at 5:38:13 p.m.[35]

59.     Ms. Paulette Bernard, of Apt. No. 1003, watched the incident unfold, and stated that Officer Williams was four parking spaces away from Mr. Pheap when he fired the fatal shot. If Officer Williams was indeed "four parking spaces away" from Mr. Pheap when he fired, considering the average width of parking spaces in the United States,[36] that would mean the men were separated by approximately forty (40) feet.

60.     Witness Patsy Ellison told investigators that after breaking free from Officer Williams, Mr. Pheap had taken off running. She saw Officer Williams, by then standing, "pull his gun." She "saw the gun go off" and saw Mr. Pheap being shot, *as he was running away.*

---

[33]The Medical Examiner indicated that because Mr. Pheap's spinal cord was not damaged, he had ten to fifteen seconds of blood in his brain to continue mobility, explaining his ability to run after being shot.

[34]KCSO collected a small piece of tin foil next to Mr. Pheap's body. TBI forensic chemical analysis showed the residue inside the foil was cocaine. The TBI's Crime Lab Official Toxicology Report showed Mr. Pheap was positive for cocaine at the time of the shooting. Mr. Pheap was also positive for the cocaine metabolites anhydroecgonine methyl ester and ecgonine methyl ester.

[35]The shooting of Mr. Pheap was the fourth officer-involved shooting by KPD officers since November 2018.

[36]Minimum width standards of parking spaces usually range from 8.5 to 9.0 feet (2.6–2.7 m). In the United States, due to vehicles being larger on average than some other countries, a parking space is 10 feet (3.0 m) wide.

-24-

61. Witness Matthew Ellison, who also saw the incident, told investigators that Officer Williams fired the shots at Mr. Pheap *while Mr. Pheap was running away*.

62. One witness, identified by DA Allen as "Witness 4," stated that Mr. Pheap "started to run" and Officer Williams fired, as Mr. Pheap was "facing away" from Officer Williams.

63. On the cruiser-audio, immediately after the shooting, someone is overheard asking Officer Williams why he shot Mr. Pheap. He responded, "he took my TASER and *tried to tase me*," implying that Mr. Pheap had actually not tased him.

## I.   Chief Medical Examiner's Final Autopsy Report: "Gunshot Wound of Back."

64. On August 31, 2019, Christopher Lochmuller, MD, the Knox County Chief Deputy Medical Examiner presented Mr. Pheap's final autopsy report, indicating that Mr. Pheap was pronounced dead at 6:37 p.m. on August 26, 2019. He was killed by a "large caliber, jacketed, open hollow point, moderately deformed bullet."

65. The final autopsy report concluded that Mr. Pheap "[d]ied of gunshot wound of back." While DA Allen disputed the fact that Mr. Pheap was *shot in the back* at her November 2019 press conference and in her written findings, suggesting that Mr. Pheap was hit *"in the side,"* as if he had been facing Officer Williams, the autopsy left no doubt that <u>Mr. Pheap was shot in the back</u>:

- "An autopsy revealed a single gunshot wound on the left side of the upper back associated with significant internal bleeding, a fractured rib, and severe organ injury."

- "Penetrating gunshot wound of back"

-25-

- ■ "Entrance: left upper back"

- ■ "Trajectory: The wound track travels from the decedent's back to front, left to right, and down."

- ■ "Clothing: The left side of the upper aspect of the back of the grey T-shirt has a 1/2 x 3/8 inch defect with a ragged edge, which corresponds to the entrance gunshot wound on the left side of the upper back."

## J. Officer Williams' Private Statement

66. Days after the shooting death of Mr. Pheap, Officer Williams released a statement through a private attorney stating, among over self-serving allegations, that Mr. Pheap was not shot in the back, as the Medical Examiner's office had reported, but that Mr. Pheap "was shot once *on the side* of his body."

## K. KCSO and DA Allen's Exoneration of Officer Williams for Fatally Shooting Mr. Pheap.

67. Although the KPD's General Order 1.6 (VII) provided in August 2019 and continues to provide that "[t]he Internal Affairs Unit and Tennessee Bureau of Investigation shall conduct simultaneous investigations in all incidents where a lethal response is employed resulting in injury or death,"[37] the investigation into the shooting death of Mr. Pheap was instead performed by the KCSO under a Memorandum of Understanding for Officer-Involved Shootings between the City and Knox County.[38]

---

[37]General Order 1.6 also provides that "[r]eports and investigative findings will be reviewed by the Critical Incident Review Board, upon request of the Chief of Police." In this instance, it appears Chief Thomas did not make such a request.

[38]After Plaintiff's attorneys dispatched their own investigators to Clear Springs Apartments to question potential witnesses, KCSO investigators told

-26-

68.     Approximately ten weeks after the fatal shooting of Mr. Pheap, and after

stonewalling both the public and Plaintiff's attorneys from information about the fatal

shooting,[39] on November 7, 2019, DA Allen called a media conference to announce the

exoneration of Officer Williams in the fatal shooting of Mr. Pheap.

69.     DA Allen announced the findings that the actions of Officer Williams:

> "were subjectively and objectively justified. I further
> conclude that the method, manner, and amount of force
> utilized in this incident amounted to a necessary response
> to thwart the threat involved. I am closing this investigation
> as a justifiable homicide."

70.     DA Allen also stated that "the proof supports Ofc. Williams' statement

that he fired at Pheap while Pheap was firing the taser at him." According to DA Allen,

> "[t]he timeline contradicts the possibility that Pheap had
> disengaged from the fight with Ofc. Williams over that taser
> and had enough time to run away before being shot. Viewed
> under the totality of the circumstances, the evidence
> supports that Ofc. Williams shot Pheap while Pheap was
> shooting Ofc. Williams with the taser."

71.     DA Allen further found that:

---

witnesses they did not have to speak to them, implying Plaintiff's attorneys' own
investigation of their Mr. Pheap's death was unlawful, even threatening to report
Plaintiff's investigators to DA Allen, telling one witness: "We're gonna let the
District Attorney's Office know that's going on, too. Ok?"

[39]Plaintiff's attorneys were ultimately compelled to file a lawsuit in the
Chancery Court of Knox County to obtain public records concerning the facts
surrounding Mr. Pheap's shooting death. *See Baker, et al. v. City of Knoxville, et al.*,
No. 199037-1 (Knox Chancery Jan. 14, 2020). Notably, although Officer Williams
was required by KPD policy to complete a Use of Force Report and a Firearms Use
Report, *see* General Order 1.6 (VII)(C), if those reports were completed, they were
not produced, despite requests under the Tennessee Public Records Act.

-27-

"Ofc. Williams had probable cause to believe that Pheap posed a threat of serious bodily injury under Tenn. Code Ann. § 39-11-620. Additionally, Ofc. Williams had a reasonable belief, founded upon reasonable grounds, that Pheap posed an imminent real danger of death or serious bodily injury as discussed in the self-defense statute, Tenn. Code Ann. § 39-11-611."

**L.    Mr. Pheap Was Not an Imminent Serious Physical Threat to Officer Williams at the Time He Was Shot.**

72.    The exoneration of Officer Williams by DA Allen largely hinged on speculation about the alleged threat posed by Mr. Pheap — and particularly the imminence of that alleged threat – rather than the actual evidence.  That speculation led DA Allen far astray from the relevant and more narrow question at stake: whether Officer Williams had probable cause to believe Mr. Pheap posed an imminent serious physical threat.

73.    Statements from witnesses and the presence of physical evidence indicate that Officer Williams was not in any imminent danger from Mr. Pheap when he fired the two rounds from his Sig Sauer, hitting him once in the upper back and mortally wounding him. By the time Mr. Pheap began to flee from Officer Williams in the parking lot, Officer Williams's single-shot TASER had already been errantly deployed, its wires now dangling off Officer Williams' utility belt. By then, Mr. Pheap was approximately 40 feet away from Officer Williams, well beyond the 25-feet length of the TASER wires. In short, Mr. Pheap simply could not have been holding onto the TASER at this point when he was beyond the length of the wires.

-28-

74.     And the distance between Mr. Pheap and Officer Williams had only increased as Mr. Pheap kept running away. This lengthening of space meant that the reasonable thing for any officer to have done was to monitor Mr Pheap or issue a warning. Certainly, at that particular moment, Mr. Pheap posed no significant threat of death or serious physical injury to Officer Williams.

75.     If Mr. Pheap was still running away from Officer Williams, as multiple witnesses describe, there was no risk to life or serious bodily injury by then, especially if Mr. Pheap had dropped the TASER. The distance between the two men when Mr. Pheap was shot corroborates this observation.[40] And so, even if Mr. Pheap had the TASER in his hand as he was running away, he could not have been holding it if he was more than 25 feet away.

**M.     Officer Williams Failed to Warn Mr. Pheap Before Firing Two Shots at Him.**

76.     Under *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), Officer Williams also had a legal obligation to warn Mr. Pheap that he was going to fire at him, when feasible under the circumstances. Under the circumstances described above, it was entirely feasible for Officer Williams to have warned Mr. Pheap that he would shoot or otherwise use deadly force before he fired at Mr. Pheap. Yet, there is nothing to indicate that Officer Williams warned Mr. Pheap before he fired two rounds at him.

---

[40]Dr. Lochmuller, Knox County's Deputy Chief Medical Examiner, stated that he examined Mr. Pheap's shirt and "did not find any evidence of soot or stipple." This finding suggests that the shot was not made at a close range.

-29-

77.     Notwithstanding that Mr. Pheap had, by at least one eyewitness account, dropped the TASER, that Mr. Pheap was, by multiple eyewitness accounts, running away from Officer Williams, and that despite Mr. Pheap's increasing distance (approximately 40 feet) from Officer Williams, Officer Williams *still did not warn Mr. Pheap* that he was going to use deadly force and shoot. At a minimum, Officer Williams could have warned Mr. Pheap and waited, even a fraction of a second, to gauge Mr. Pheap's response to having a .45 handgun leveled at him.

## V.  WAIVER OF IMMUNITY

78.     The City has waived immunity for its own negligence and for its employees, misconduct of officers acting under color of law, and for the negligence of officers, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI.  CLAIMS FOR RELIEF

### COUNT ONE

### EXCESSIVE FORCE

**Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Fourth and Fourteenth Amendments**

**(Against Officer Williams, Individually)**

79.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

80.     Officer Williams used excessive force when he seized, shot, and killed Mr. Pheap. Officer Williams' unjustified shooting deprived Mr. Pheap of his fundamental

-30-

interest in life and his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution, as applied to state actors by the Fourteenth Amendment.

81.     According to KPD's written policy, lethal force,[41] such as that used by Officer Williams against Mr. Pheap, is only authorized under the following circumstances:

> To protect the member or others from what is reasonably believed to be an imminent threat of death or serious bodily injury.
>
> In accordance to T.C.A. 39-11-620, to effect an arrest only if all other reasonable means of apprehension have been exhausted or are unavailable, and where feasible, the officer has given notice of the officer's identity as such and given a warning that lethal force may be used unless resistance or flight ceases, and:
>
> 1.     The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or
>
> 2.     The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

*See* General Order 1.6.[42]

---

[41]"Lethal force," according to KPD policy, is "[a]ny force that is likely to cause death or serious bodily injury." *See* General Order 1.6(II)(I).

[42]General Order 1.6 further provides that "lethal force/response shall not be used in the following circumstances:

***

-31-

82. When Officer Williams fired two rounds at Mr. Pheap from his .45 Sig Sauer, he had not yet exhausted "all other reasonable means of apprehension, including many of the following force-options available to KPD officers when a subject is "passively resistant, active resistant and/or actively aggressive":

- "Empty Hand Hard" – strikes, kicks, leg-sweeps, trips, tackles and bi-lateral neck restraints to effect control of the resisting subject;

- "Empty Hand Soft" techniques – empty hand escort controls, pressure points, come-a-longs, and directional controls that have a minimal chance of inflicting injury;

- Oleoresin Capsicum (OC) Spray (pepper-spray);

- Baton;

- TASER Conducted Energy Weapon (CEW); and

- Bi-lateral Neck Restraint/Shoulder Pins

83. In this particular instance, Officer Williams had more force-options available to him than most KPD officers, as he was also assigned to a canine (K-9) unit, and his K-9, Nash, accompanied him to the apartments in the back of the Tahoe.

84. Officer Williams was armed with a TASER, model X26P, manufactured by AXON. According to AXON's marketing materials, the X26P is a single-shot CEW that is the smallest and compact of AXON's TASERs. Upon firing, the X26P emits 2 probe-darts attached to insulated conductive wires that travel a distance of up to 25

---

iv. In situations involving misdemeanor offenses."

*See* General Order 1.6(V).

-32-

feet[43] to reach their target.[44] The X26P delivers an electric pulse to the target, which overrides the sensory and motor functions of the central nervous system. A single trigger pull and release discharges an electrical charge for a 5-second cycle. Once a cartridge is fired, the operator can re-energize it by pulling the trigger.

85. At the moment Officer Williams fired two shots at Mr. Pheap, he lacked probable cause to believe Mr. Pheap posed a threat of serious bodily injury and also lacked reasonable grounds to believe Mr. Pheap posed an imminent real danger of death or serious bodily injury.

86. Indeed, when Officer Williams fired the two shots, Mr. Pheap was unarmed, having dropped the TASER (assuming he ever had it in the first place, which Plaintiff disputes), and was running away, his back to Officer Williams. He had no means of escape, as the vehicle in which he had arrived at the apartments was blocked-in by Officer Williams' Tahoe and he could have been easily identified.[45]

87. According to at least one eyewitness, Mr. Pheap was four parking spaces away (as much as 40 feet) from Officer Williams at the moment he was shot, giving Officer Williams plenty of space to: (a) radio for backup, (b) retrieve his K-9 from the Tahoe to pursue Mr. Pheap, or (c) re-deploy his TASER, among other possibilities.

---

[43]A photo of the blast doors on Officer Williams's TASER revealed green blast doors, which AXON's website indicates is a cartridge containing 25-foot-long wires.

[44]AXON suggests the rule of thumb is a 1 foot (.3 m) spread for every 7 feet (2.1 m) the probes travel.

[45]Notably, the registered owner of the Dodge Neon resided at the apartments. Thus, it would have been relatively easy for officers to identify Mr. Pheap.

-33-

88. According to Officer Williams, the KCSO, and DA Allen, it was Mr. Pheap's possession of Officer Williams' TASER that gave rise to the purported "imminent threat of death or serious physical harm" to Officer Williams. But Mr. Pheap was running way. And if Mr. Pheap ever had the TASER, he had since dropped it, as indicated by the lengthening of the distance between him and Officer Williams, who had a TASER-dart stuck in his utility belt at the moment he fired at Mr. Pheap.

89. To the extent Officer Williams might continue to insist that Mr. Pheap tased him, that Mr. Pheap still controlled the TASER, or that Mr. Pheap had the ability to use the TASER on him, this still would not have justified Officer William's use of deadly force against Mr. Pheap in this particular instance.

90. In this federal circuit, the use of a TASER device constitutes non-lethal force. *See Roberts v. Manigold*, 240 F. App'x 675, 678, n.4 (6th Cir. 2007); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045-46 (6th Cir. 1992); *Haupricht v. Contrada*, 2009 U.S. Dist. LEXIS 116780, at *10 (N.D. Ohio Dec. 15, 2009).[46]

---

[46]Other federal circuits follow suit. *See, e.g.*, *Simmons v. Rhodes*, 2016 U.S. Dist. LEXIS 99473, at *6 (E.D. Ark. July 28, 2016) (TASER is not deadly force); *Glenn v. City of Columbus, Ga.*, 375 Fed. Appx. 928, 2010 U.S. App. LEXIS 8276, at *5 (11th Cir. Apr. 20, 2010) (per curiam) (beanbag munition was not deadly force; instead, it "lies in the unwashed middle somewhere between deadly force and the use of a Taser gun"); *Bryan v. MacPherson*, 608 F.3d 614, 621-22 (9th Cir. 2010), rehearing on banc denied by 630 F.3d 805, 2010 WL 4925422 (Nov. 30, 2010) ("We, along with our sister circuits, have held that tasers and stun guns fall into the category of non-lethal force. . . ."); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 969 n. 8 (9th Cir. 2005) ("The officers did not bring with them any of the variety of non-lethal 'pain compliance' weapons used by police forces, such as tasers or stunbag shotguns").

-34-

91.     Nor does the use of a TASER create an imminent threat of serious bodily injury, as Officer Williams, the KCSO, and DA Allen suggest. *See, e.g., Lindsay v. Kiernan*, 378 Fed. Appx. 606, 608 n. 3 (9th Cir. Apr. 29, 2010) ("Lindsay fails to demonstrate on this record that deployment of a taser at a gas station 'creates a substantial risk of causing death or serious bodily injury.'").

92.     If Mr. Pheap did not have the TASER, there has been no indication whatsoever that Mr. Pheap was otherwise armed with a weapon of any type. And no weapon was discovered on or around his body after his death.

93.     No reasonable officer under the circumstances would have believed that the use of deadly force against Mr. Pheap was lawful. Officer Williams thus lacked probable cause or reasonable suspicion to believe Mr. Pheap posed an imminent danger of death or serious physical harm to him (or to others). Even if some force were constitutionally reasonable, the degree of force used here – firing two rounds at a fleeing Mr. Pheap – was clearly excessive and unconstitutionally disproportionate in degree to the circumstances.

94.     In addition to unreasonably using deadly force against Mr. Pheap, Officer Williams also failed to warn Mr. Pheap that he was going to shoot to kill him. His failure to warn was striking, even making allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving, as the Supreme Court emphasized 35 years ago the importance of warnings when feasible before using lethal force. *See Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Nor can Officer Williams' omission of any meaningful warning in this

-35-

instance be excused by inferring that the circumstances were too "tense, uncertain, and rapidly evolving" to undercut foundational principles of law enforcement conduct.

95.     Officer Williams' use of deadly force in shooting Mr. Pheap was legally unjustified and objectively unreasonable and violated Mr. Pheap's rights to be free of unreasonable seizure and use of excessive force under the Fourth Amendment. *E.g., Tennessee v. Garner*, 471 U.S. 1, 12-12, 21(1985); *see, e.g., Graham v. O'Connor*, 490 U.S. 386, 396 (1989). This right to be free of the use of objectively unreasonable deadly force was also clearly established at the time and had been so for decades.

96.     Mr. Pheap died from a gunshot wound to the back. Officer Williams' actions and omissions, including his unreasonable and unjustified use of deadly force against Mr. Pheap, proximately caused Mr. Pheap's death. His actions and omissions also deprived Mr. Pheap of his fundamental interest in life, in violation of the United States Constitution. As a result, Officer Williams is liable for Mr. Pheap's death.

97.     Specifically, Officer Williams' violations of Mr. Pheap's Fourth Amendment rights directly and proximately caused Mr. Pheap to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Mr. Pheap's estate, through Plaintiff; and (f) the loss of society and companionship for Mr. Pheap's minor daughter.

-36-

98. Furthermore, the conduct of Officer Williams was also willful, wanton, malicious, deliberately indifferent, and done with reckless disregard for Mr. Pheap's federally-protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct. and therefore warrants the imposition of exemplary and punitive damages.

99. Plaintiff sues the Officer Williams for its violation of Mr. Pheap's constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

## FAILURE TO TRAIN AND SUPERVISE

### Violation of Civil Rights under Color of Law,
### 42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments

### (Against the City and Chief Thomas, Individually)

100. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

101. As Chief of Police of the City, Chief Thomas has final authority and makes policy for the City and KPD in establishing and implementing policies and/or procedures with respect to the use of force by police against citizens (including both less-lethal and deadly force), as well, as the legal limits of such activities, for police officers employed by the KPD.

102. Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of deadly force are so patently obvious that the City and

-37-

Chief Thomas are liable under § 1983. Officer Williams' actions –

    ■ the unnecessary tackling of Mr. Pheap that escalated the confrontation;

    ■ the complete failure to utilize the force-continuum in choosing which methods of force to utilize on Mr. Pheap;

    ■ the failure to effectively use non-deadly force; and

    ■ the unnecessary and unreasonable use of deadly force without warning against a fleeing and unarmed misdemeanor traffic offense suspect –

demonstrate such obvious and egregious training and supervisory deficiencies to make KPD's use-of-force training constitutionally defective.

103. Upon information and belief, as final policymaker for the KPD, Chief Thomas established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding the use of force by KPD officers against citizens (including less-lethal and deadly force), which policies and procedures themselves violate federal constitutional law.

104. Even if the policies and procedures regarding the use of force by police against citizens (including both less-lethal and deadly force) do not themselves violate federal law, there is and was – at the time of the deadly encounter between Officer Williams and Mr. Pheap – a persistent and widespread practice among KPD officers of using excessive and/or deadly force on a subject when it is unnecessary and objectively unreasonable as a matter of law to do so, amounting to a custom or course of conduct so widespread as to become informal KPD policy, acquiring the force of law.

-38-

105.   And even if the formal policies and procedures of the KPD are not themselves unlawful, alternatively, the operation of such policies and procedures "on the street" reflects a standard operating procedure, and a widespread and persistent practice, of KPD officers violating citizens' federally-protected rights as identified herein. This standard operating procedure is shown by citizen lawsuits charging police misconduct; citizen complaints regarding such misconduct; and the KPD's limited internal records of individual instances of application of these policies and procedures, such as incidents involving the use of less lethal and deadly force.

106.   The fact that the provisions of General Order 1.6 have been disregarded by Chief Thomas – insofar as the TBI has not been enlisted, as mandated by that order – to conduct <u>simultaneous investigations</u> with respect to "all incidents where a lethal response is employed resulting in injury or death," further indicates nothing less than *a defacto policy* against the independent review of deadly force incidents and a policy of acquiescence to the unreasonable use of deadly force. Such a practice effectively immunizes the City from accountability for such unreasonable uses of deadly force by KPD officers as occurred in this case.[47]

107.   At all times material to this complaint, Chief Thomas and the City have known or have had constructive knowledge of this widespread and persistent practice of violations, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations.

---

[47]Nor has Chief Thomas requested review of such incidents by the Critical Incident Review Board, as provided by General Order 1.6.

-39-

108.   The response by Chief Thomas and the City to this widespread and persistent practice of constitutional violations has been inadequate.  These include but are not limited to:

- the lack of or inadequate mechanism for identifying or tracking unconstitutional uses of force;

- the lack of or inadequate documentation of individual uses of force, and the justification for such;

- the lack of or inadequate supervisory review of documentation of individual uses of force and the justification for such;

- the lack of or inadequate mechanism for monitoring or tracking uses of force;

- the lack of unbiased investigation of complaints of improper uses of force;

- the lack of or inadequate investigation of complaints of improper uses of force;

- the lack of or inadequate training regarding the legal limitations on the permissible use of force, both less-lethal and deadly force; and

- the lack of or inadequate discipline of individual officers found to have committed unlawful uses of force.

109.   Violations of citizens' constitutional rights of the type inflicted on Mr. Pheap, specifically including the use of excessive and/or deadly force, are the known or obvious consequences either of formal City or KPD policies and procedures that themselves violate federal law, or of a widespread and persistent practice and custom of such violations in which Chief Thomas and the City have acquiesced or which they

-40-

have tacitly authorized. The actions and omissions of Chief Thomas and the City, as identified herein, reflect deliberate indifference on the part of Chief Thomas and the City to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Mr. Pheap's federally-protected rights.

110. Such widespread and persistent practices of violations by City officers of citizens' constitutional tights, as acquiesced in by Chief Thomas and the City, were the moving force behind – and directly and proximately caused – the violations of Mr. Pheap's rights and his death; and render the City liable for the causal connection between this deliberate indifference and Officer Williams's violations of Mr. Pheap's rights, and/or the City's custom or practice of constitutional violations that proximately resulted in the violation of Mr. Pheap's rights.

111. The City, KPD, and Chief Thomas failed to train and supervise officers or employees to avoid the use of excessive force, including less-lethal and deadly force, failed to meaningfully investigate allegations of such force, failed to seek independent review of deadly force incidents by the TBI, as mandated by General Order 1.6, and have attempted to conceal unconstitutional conduct by failing to conduct transparent investigations, and by exonerating officers, like Officer Williams, through sham investigations focused on exonerating KPD officers, rather than searching for justice.

112. The City, KPD, and Chief Thomas had a duty of care to Mr. Pheap to ensure that KPD officers were properly trained in the appropriate procedure for using deadly force. This duty extends to ensuring that KPD officers were properly trained concerning the limits of their authority to use deadly force.

-41-

113. The City, KPD, and Chief Thomas also had a duty to properly supervise KPD officers and to ensure that KPD supervisory officers do not condone the unnecessary use of force, including deadly force. This is especially true when there is (a) a "likelihood that [a] situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Here, routine investigations of hit and run accidents or similar traffic incidents by KPD patrol officers are a frequent part of their daily shifts. Officers must have specific training to be equipped to properly react to recurring situations, such as the one presented, without unnecessarily escalating them.

114. In this case, Officer Williams lacked the tools the City, KPD, and Chief Thomas should have provided him to allow him to safely handle the situation that confronted him. Consequently, Officer Williams wound up unnecessarily escalating the level of force and needlessly causing a citizen's death, over what began as a routine investigation of a misdemeanor traffic offense.

115. By not enlisting the TBI to conduct a simultaneous investigation, as policy dictated, and by not conducting a meaningful investigation herself, Chief Thomas essentially let it be known that she condoned Officer Williams' unreasonable use of deadly force.

116. By so ratifying Officer Williams' unreasonable use-of-deadly force against Mr. Pheap, Chief Thomas also knowingly acquiesced in the unconstitutional conduct of Officer Williams through the execution of her job functions, rendering the City liable to Plaintiff.

-42-

117. The City, KPD, and Chief Thomas' failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use-of-force and to properly train its officers and supervisors to follow such guidelines constitute deliberate indifference to the constitutional rights of citizens.

118. The failure of Chief Thomas – and unknown supervisors – to recognize or appreciate the gravity of Officer Williams' actions imply that they, too, found no wrong in his conduct, all but "green lighting" Fourth Amendment violations by KPD officers.

119. Here, Officer Williams believed that his actions would not be properly monitored or corrected by supervisory officers and that his misconduct would be tolerated and accepted. His belief was prescient.

120. As a direct and proximate result of the actions and omissions of the City, KPD, and Chief Thomas causing the violation of his Fourth Amendment rights, Mr. Pheap suffered (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Mr. Pheap's estate, through Plaintiff; and (f) the loss of society and companionship for Mr. Pheap's minor daughter.

121. Plaintiff sues the City and Chief Thomas for violating Mr. Pheap's constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

-43-

## COUNT THREE

## WRONGFUL DEATH

## TENN. CODE ANN. §§ 20-5-106 et seq.

## (Against All Defendants)

122.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

123.    Plaintiff brings this action as the Court-appointed Administratrix and Personal Representative of the Estate of Channara Pheap, as authorized by Tenn. Code Ann. §§ 20-5-106 et seq., Tennessee's Wrongful Death Statute.

124.    Defendants owed a duty of due care to Mr. Pheap at all times relevant to this action, and violated that duty in the manner alleged herein.

125.    Officer Williams knew that Mr. Pheap was unarmed and running away from him – at an approximate distance of 40 feet – when he fired on him twice and fatally shot him in the back with his .45 Sig Sauer. Mr. Pheap posed no threat to Officer Williams' safety – imminent or otherwise – at that moment.

126.    The foregoing acts of Officer Williams proximately caused the fatal injuries to Mr. Pheap, entitling Plaintiff to recover compensatory damages from the Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Mr. Pheap suffered before his death, Mr. Pheap's lost

-44-

wages, funeral, and/or related burial expenses, and loss of society and companionship for Mr. Pheap's minor daughter.

127.    The intentional and negligent actions of Defendants were performed knowingly, wantonly and with gross disregard for the safety and welfare of Mr. Pheap.

128.    Based upon the foregoing allegations of this Complaint, Plaintiff is entitled to recover a judgment in the amount of Five-Million Dollars ($5,000,000) in compensatory damages and Five Million Dollars ($5,000,000) in punitive damages.

## COUNT FOUR

### BATTERY

### (Against Officer Williams)

129.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

130.    The above-described fatal shooting of the fleeing Mr. Pheap by Officer Williams, acting under color of law and in the course and scope of his employment for the City, constitutes a battery against Mr. Pheap.

131.    As a direct and proximate result of the actions of Officer Williams, Mr. Pheap suffered severe pain and suffering, and died from his injuries. Officer Williams had no legal justification for using deadly force against Mr. Pheap, and officer Williams' use of such deadly force while carrying out his duties as such an officer was unreasonable under the circumstances. As such, it constituted a battery under Tennessee law.

-45-

132.    The foregoing acts of Officer Williams proximately caused the fatal injuries to Mr. Pheap, entitling Plaintiff to recover compensatory damages from the Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Mr. Pheap suffered before his death, Mr. Pheap's lost wages, funeral, and/or related burial expenses, and loss of society and companionship for Mr. Pheap's minor daughter.

133.    The conduct of Officer Williams was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Mr. Pheap, entitling Plaintiff to an award of punitive damages.

## COUNT FIVE

## NEGLIGENCE

## (Against All Defendants)

134.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

135.    Defendants had a duty to Mr. Pheap to act with ordinary care and prudence so as not to cause him harm or injury.

136.    The actions and inactions of Defendants were negligent and reckless, including but not limited to, the negligent use of deadly force against Mr. Pheap, which resulted in Mr. Pheap's death.

137.    Defendants owed a duty to the public in general and to Mr. Pheap specifically to use due care in fulfilling duties as police officers and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted

-46-

police standards. Defendants failed to use due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

138. Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Mr. Pheap a duty of care to be free from excessive force and to protect him from injury.

139. Defendants breached those duties of care, as set forth herein.

140. As a direct and proximate result of Defendants' conduct, as alleged above, and other undiscovered negligent conduct, Mr. Pheap was caused to suffer severe pain and suffering and ultimately died.

141. The foregoing acts of Officer Williams proximately caused the fatal injuries to Mr. Pheap, entitling Plaintiff to recover compensatory damages from the Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Mr. Pheap suffered before his death, Mr. Pheap's lost wages, funeral, and/or related burial expenses, and loss of society and companionship for Mr. Pheap's minor daughter.

## VII.   JURY DEMAND

142. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A. That Defendants be served with a copy of this Complaint and be required to answer;

-47-

B.     That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.     That Plaintiff be awarded such damages as will fully compensate Plaintiff for all injuries proximately caused by Defendants' actions and that a judgment in Plaintiff's favor be entered;

D.     That Plaintiff be awarded compensatory damages in an amount to be determined by the trier of fact, not to exceed $5,000,000;

E.     That Plaintiff be awarded punitive damages in an amount to be determined by the trier of fact, not to exceed $5,000,000;

F.     That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.     That Plaintiff be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 26th day of August, 2020.

/s/ Lance K. Baker
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

Joshua D. Hedrick, Esq.
**WHITT, COOPER, HEDRICK**
  **& WOJCIK**
607 Market Street, Suite 1100
Knoxville, TN 37902
Tel: (865) 518-7073
Email: hedrick@knoxdefense.com

*Counsel for Plaintiff*

-49-