UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| SOPHIA PHEAP, as Administratrix and Personal Representative of the Estate of CHANNARA PHEAP, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF KNOXVILLE, et al., <br><br> Defendants. | 3:20-CV-00387-DCLC-DCP |

**MEMORANDUM OPINION AND ORDER**

The case arises from the fatal shooting of Channara Tom "Philly" Pheap ("Mr. Pheap") by Knoxville Police Department ("KPD") Officer Dylan M. Williams ("Officer Williams"), during his investigation of a hit-and-run collision at Clear Springs Apartments in Knoxville, Tennessee on August 26, 2019. Sophia Pheap, Mr. Pheap's sister and the Administratrix and Personal Representative of Mr. Pheap's Estate, brought this action against Officer Williams, the City of Knoxville, Tennessee, KPD Chief Eve M. Thomas, and Jane Does 1–5 [Doc. 1]. As to Officer Williams, Plaintiff alleges one count of excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, along with claims under Tennessee law for wrongful death, battery, and negligence [*Id.*].

This matter is currently before the Court on Officer Williams's Motion for Summary Judgment [Doc. 34]. Following a period of limited discovery, Plaintiff responded in opposition [Doc. 66] and Officer Williams replied [Doc. 70]. The motion is now ripe for resolution. For the reasons stated herein, Officer Williams's Motion for Summary Judgment [Doc. 34] is **DENIED**.

1

I.      BACKGROUND

On August 26, 2019, Officer Williams received information from dispatch regarding a hit-and-run collision that had just occurred within his district [Doc. 67, ¶ 1]. Dispatch described the suspect vehicle as a gold sedan and, after running the license plate number, Officer Williams determined that the make of the vehicle was Dodge and the registered owner lived at Clear Springs Apartments on Merchant Drive in Knoxville, Tennessee (formerly known as "Tillery Ridge Apartments") [*Id.* at ¶¶ 2–5]. Officer Williams proceeded to Clear Springs Apartments and, as he pulled into the parking lot at approximately 5:30 p.m., he observed a gold Dodge sedan parked in the lot with a license plate number matching that of the suspect vehicle [*Id.* at ¶¶ 6–8].

Officer Williams parked his patrol cruiser at an angle directly behind the gold sedan [*Id.* at ¶ 9].[1] Noticing that no one was in the vehicle, Officer Williams approached a ground level apartment unit and asked the individuals inside if they knew who drove the gold sedan [*Id.* at ¶¶ 12–13]. A woman, later identified as April Barnard, came out onto the porch to speak with Officer Williams. Ms. Barnard stated that the driver lived on the third floor of the apartment building and directed Officer Williams around the corner to the back of the building to access the stairs leading to the third floor [*Id.* at ¶¶ 14–15]. Officer Williams proceeded around the corner of the building and out of view of his dash camera [*Id.* at ¶ 16; Doc. 34-6 at 17:35:38].

As Officer Williams approached the stairs, he observed Mr. Pheap coming down the stairs [Doc. 67, ¶ 17]. Officer Williams testified that Mr. Pheap was fidgeting, acting nervous, and repeatedly attempting to reach his hands into his pockets [*Id.* at ¶¶ 19–20]. He also testified that he saw a "bulge" in Mr. Pheap's pocket, and that Mr. Pheap ignored multiple verbal commands to

---

[1]     The dash camera in the patrol cruiser recorded continuously from this angle and the microphone on Officer Williams's uniform recorded audio, both of which were manually filed with the Court [Doc. 34-6].

2

keep his hands out of his pockets [*Id*. at ¶ 23]. Officer Williams further testified that Mr. Pheap could not maintain eye contact as he scanned his surroundings, which he interpreted as an effort by Mr. Pheap to look for an imminent path of escape [*Id*. at ¶¶ 21–22]. Shortly after encountering Mr. Pheap, Officer Williams requested a description of the driver over his radio [*Id*. at ¶ 25]. In response, he received a physical description of the driver as "light to medium skin, black or Hispanic male," which he observed to be consistent with Mr. Pheap's appearance [*Id*. at ¶ 26].

Due to Mr. Pheap's demeanor and the consistency of his physical appearance with the description of the driver, Officer Williams decided to conduct a pat-down search and asked Mr. Pheap if he could search his pockets to determine if he possessed the keys to the gold sedan and/or any weapons [*Id*. at ¶ 28]. As Officer Williams attempted to conduct the pat down, a struggle ensued and both men rolled down the hill between the apartment buildings into the view of the dash camera [Doc. 34-6 at 17:37:14]. The struggle continued as Officer Williams attempted to subdue Mr. Pheap but Mr. Pheap eventually gained position on top of Officer Williams, who was laying on the ground flat on his back [*Id*. at 17:37:22]. Officer Williams testified that, at this point, Mr. Pheap used his arm to push on Officer Williams's neck and/or throat with substantial force, making it difficult for Officer Williams to breathe [Doc. 67, ¶ 47]. Officer Williams can be heard telling Mr. Pheap to "stop" multiple times while Mr. Pheap is positioned on top of him [Doc. 34-6 at 17:37:22].

Mr. Pheap then stood up and ran away from Officer Williams into the parking lot and out of view of the dash camera [Doc. 67, ¶ 49; Doc. 34-6 at 17:37:33]. As Officer Williams followed Mr. Pheap into the parking lot, he drew his taser and disengaged its safety mechanism [Doc. 67, ¶ 51]. Officer Williams warned Mr. Pheap that he was going to tase him, and Mr. Pheap stopped near the back of Officer Williams's patrol cruiser, put his hands up, and turned to face Officer

3

Williams [*Id*. at ¶¶ 52–54]. With his taser still raised, Officer Williams approached Mr. Pheap and gave him multiple commands to get on the ground [*Id*. at ¶¶ 55–56]. At this point, another struggle can be heard, followed by the sound of two gunshots [Doc. 34-6 at 17:37:41–17:37:55]. It is undisputed that another struggle occurred between Officer Williams and Mr. Pheap and, thereafter, Officer Williams drew his firearm and fired two rounds, one of which mortally wounded Mr. Pheap [Doc. 67, ¶ 95]. However, the parties largely dispute what took place during the struggle and immediately prior to the shooting.

Officer Williams recounts the moments leading up to the shooting as follows. Mr. Pheap ignored his commands to get on the ground, suddenly lunged at Officer Williams, and grabbed his taser [Doc. 34-1, ¶ 14]. Officer Williams and Mr. Pheap struggled over control of the taser, but Mr. Pheap was able to pull the taser from Officer Williams's grasp and gain complete control of it [*Id*. ¶ 17]. From approximately six or seven feet away, Mr. Pheap pointed the taser directly at Officer Williams, who turned to his left, crouched down, and covered his face [*Id*.]. Mr. Pheap then fired the taser at Officer Williams, and he felt the probes impact his body and felt electricity in his arms and neck [*Id*.]. Fearing that Mr. Pheap could overpower him or pull the trigger on the taser to deliver another shock, Officer Williams drew his firearm and, from approximately six or seven feet away, fired two rounds at Mr. Pheap [*Id*.]. Officer Williams contends that Mr. Pheap was still facing him and maintained complete control of the taser when he fired the two rounds [*Id*. at ¶ 18]. Mr. Pheap then turned away, ran a short distance through the parking lot, and fell to the ground behind a dumpster [*Id*. at ¶ 19].

Plaintiff disputes the majority of Officer Williams's version of what transpired. First, Plaintiff asserts that forensic evidence and eyewitness testimony contradict both the claim that Mr. Pheap grabbed the taser and the claim that he aimed and fired it at Officer Williams [Doc. 66, pg.

4

9]. Rather, she argues that Mr. Pheap grabbed only the cartridge of the taser and that the taser errantly deployed during the struggle [*Id*.]. Regardless of who fired the taser or when it was deployed, Plaintiff contends that forensic evidence shows that it did not make a connection and the probes did not emit an electrical charge [*Id*. at pg. 10]. Plaintiff also points to eyewitness testimony that Officer Williams did not scream in pain, appear to be shocked or struck by the taser probes, and did not attempt to turn away or shield himself [*Id*.]. Most pertinent to the instant matter, Plaintiff argues that Mr. Pheap took off running across the parking lot and was four parking spaces, or more than 30 feet, away from Officer Williams when Officer Williams fired the two shots [*Id*. at pgs. 10–11]. Considering the taser probe wires are 25-feet long and at least one probe was stuck under Officer Williams's handcuff case on his duty belt, Plaintiff asserts that Mr. Pheap could not have been holding the taser when he was shot [*Id*. at pg. 10]. Finally, Plaintiff contends that Mr. Pheap was not facing Officer Williams when he was shot, because he died of a gunshot wound to the back [*Id*. at pg. 11].

Dr. Christopher Lochmuller, the Chief Deputy Medical Examiner for Knox and Anderson Counties, performed an autopsy on Mr. Pheap on August 27, 2019 [Doc. 34-4, ¶¶ 3, 5]. He determined that:

> Mr. Pheap's cause of death was a single gunshot wound to the left side of his upper back. The gunshot wound was located approximately eight and one-half (8½) inches left of the posterior midline of Mr. Pheap's body, and fourteen (14) inches from the top of his head. A bullet was recovered during the autopsy from the right side of Mr. Pheap's chest. The location of the entrance wound and the trajectory of the wound track reveal that the bullet, upon entering Mr. Pheap's left upper back, travelled from back to front, left to right, and down.

[*Id*. at ¶ 6]. Dr. Lochmuller opines that a reasonable interpretation of these anatomic findings could be any of the following: (1) Mr. Pheap had his left side to Officer Williams when Officer Williams fired his gun; (2) Mr. Pheap was facing Officer Williams and turned when Officer

5

Williams drew his gun; or (3) Mr. Pheap had his back to Officer Williams and turned back towards Officer Williams at the time the gun was being fired [*Id*.; Doc. 69-8, pg. 27]. Dr. Lochmuller testified that Mr. Pheap could have been shot as he was running away if he turned his left side back to look in the direction of Officer Williams [*Id*. at pgs. 28–29], but ultimately he found that "[t]here is no anatomic evidence…to definitively state that Mr. Pheap had his back to [Officer Williams] and was running away from [Officer Williams] when he was shot." [Doc. 34-4, ¶ 8].

Upon review of the statements, declarations, and deposition testimony of the individuals who witnessed the incident, some are in line with Officer Williams's version, while some support Plaintiff's. A few of the eyewitnesses also provided contradictory statements and testimony. For example, Frances Suttles, who was visiting the ground level apartment unit with April Barnard on the date in question, stated in her April 2021 Declaration that Mr. Pheap took Officer Williams's taser, aimed it at him, and fired [Doc. 34-2, ¶ 6], but during her September 2021 deposition she testified that she did not remember whether the taser deployed as the two men were struggling or whether Mr. Pheap aimed and fired it [Doc. 69-6, pg. 65]. Likewise, April Barnard told officers in October 2020 that she heard the gunshots *after* Mr. Pheap dropped the taser [Doc. 69-2, pg. 117], but in her April 2021 Declaration, she stated that Mr. Pheap was facing Officer Williams and pointing the taser at him when Officer Williams fired the two shots [Doc. 34-3, ¶ 6]. Later, during her September 2021 deposition, she testified numerous times that Officer Williams shot Mr. Pheap while he was unarmed and running away [Doc. 69-2, pgs. 60, 68–69, 73, 95].

As a result of the fatal shooting, Plaintiff initiated this action in her representative capacity on August 26, 2020 [Doc. 1]. On July 23, 2021, Officer Williams filed the Motion for Summary Judgment [Doc. 34] that is currently before the Court, arguing that he is entitled to qualified immunity and judgment as a matter of law on Plaintiff's claims.

6

## II. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Where video evidence is present, the Court shall view the facts in the light depicted by the videotape. *See Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

## III. ANALYSIS

Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Officer Williams violated Mr. Pheap's rights under the Fourth and Fourteenth Amendments in his use of deadly force against Mr. Pheap [Doc. 1]. Additionally, Plaintiff alleges that Officer Williams is liable for wrongful death, battery, and negligence under Tennessee law [*Id*]. Considering Officer Williams's motion as to Plaintiff's state law claims necessarily relies on his arguments in favor of summary judgment on Plaintiff's Section 1983 claim, the Court will first address Plaintiff's Section 1983 claim.

7

### A. Plaintiff's Section 1983 Claim of Excessive Force

42 U.S.C. § 1983 provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979). Under Section 1983, "an individual may bring a private right of action against anyone who, under color state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes." *Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011) (citations omitted). Officer Williams asserts that summary judgment in his favor on Plaintiff's Section 1983 claim of excessive force is warranted because he is entitled to qualified immunity [Doc. 40, pg. 12].

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608 (6th Cir. 2015). Once raised, a plaintiff may overcome the defense of qualified immunity only by showing that (1) viewing the facts in the light most favorable to the plaintiff, the defendant's actions violated a constitutional right and (2) such right "was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court, in its discretion, may decide which of the two prongs to address first, taking into account "the circumstances of the particular case at hand." *Pearson*, 555 U.S. at 236. Considering the facts of this case, the Court finds it appropriate to first address whether, viewing the facts in the light most favorable to Plaintiff, Officer Williams violated Mr. Pheap's Fourth Amendment rights. Next, the Court will determine whether those rights were clearly established at the time of the incident in question.

8

Case 3:20-cv-00387-DCLC-DCP Document 77 Filed 02/14/22 Page 8 of 15 PageID #: 1595

### 1. Constitutional Violation

The Fourth Amendment protects against "unreasonable searches and seizures[.]" U.S. Const. amend. IV.[2] "Determining whether the force used to effect a particular seizure is reasonable…requires a careful balancing of the nature and quality of the intrusion…against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations and internal quotations omitted). The Supreme Court has provided three factors for courts to consider in evaluating an excessive force claim: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 395.

It is well-established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). A seizure by the use of deadly force is reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Id*. at 11. The Sixth Circuit "has made the threat factor from *Graham* a minimum requirement for the use of deadly force[.]" *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). Therefore, the Court focuses its analysis on whether Mr. Pheap posed a threat of serious physical harm to Officer Williams or others. *See Jordan v. Howard*, 987 F.3d 537, 543 (6th Cir. 2021) ("While there are three factors to be considered, we are primarily focused on the second factor—whether the suspect poses an immediate threat to the safety of the officers or others.").

---

[2] Although Plaintiff alleges violations of the Fourth and Fourteenth Amendments, Plaintiff's excessive force claim is properly analyzed under the Fourth Amendment standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.") (emphasis in original).

Here, Officer Williams contends that his use of deadly force was objectively reasonable, such that his actions did not violate Mr. Pheap's Fourth Amendment rights [Doc. 40, pgs. 15–21]. Specifically, Officer Williams argues that he had probable cause to believe that Mr. Pheap posed a threat of serious physical harm based on the circumstances known to him at the time—that is, he was the only officer on the scene, Mr. Pheap acted in a nervous and threatening manner from the outset of the encounter, he saw an item in Mr. Pheap's pocket that he believed might have been a weapon, Mr. Pheap repeatedly overpowered him during the initial struggle and attempted to choke him, Mr. Pheap refused to comply with orders to get on the ground despite warnings that he would be tased, and Mr. Pheap took his taser, aimed it, and fired it at him [Doc. 40, pgs. 19–20].

Although the Court must consider the totality of the circumstances, *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007), "whether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at that moment." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). Thus, despite Mr. Pheap's physical resistance and actions during the initial part of the encounter, the question before the Court is whether Officer Williams had probable cause to believe that Mr. Pheap posed a threat of serious physical harm during the "moment immediately preceding the shooting." *Id*. at 890 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)).

According to Officer Williams, immediately prior to the shooting, he and Mr. Pheap engaged in a physical struggle over control of his taser, Mr. Pheap "wrenched" the taser away from him, aimed it, and fired it without hesitation, and continued to point the taser at him up until the moment he fired the two shots [Doc. 40, pg. 20].[3] While these facts, alone or combined with Mr.

---

[3] Officer Williams cites *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008) as a case with the "most closely analogous" circumstances to those of the instant matter [Doc. 40, pg. 18]. However, the facts presented in *Davenport* are readily distinguishable from the facts of this case.

10

Pheap's actions throughout the entire encounter, may constitute the threat of serious physical harm justifying the use of deadly force, Plaintiff argues that she has produced sufficient evidence from which a jury could conclude that Officer Williams actually shot Mr. Pheap in the back when he was unarmed, not a threat, and running away. [Doc. 66, pg. 16]. When, as here, the officer's version of the events differs substantially from the Plaintiff's, the Court is "required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott*, 550 U.S. at 378 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962)). "In qualified immunity cases, this usually means adopting…the plaintiff's version of the facts[,]" unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it[.]" *Id*. at 378, 380. That is not the case here.

     Plaintiff's version of the events—that Mr. Pheap was running away and unarmed when he was shot in the back—is not "blatantly contradicted by the record." *Id*. First, Mr. Pheap in fact died from a gunshot wound to the back [Doc. 34-4, pg. 4, Final Autopsy Report] ("This 33-year-old man, Channara T. Pheap, died of gunshot wound of back."). Although Dr. Lochmuller could not definitively state that Mr. Pheap had his back to Officer Williams and was running away when he was shot, he specifically stated that one of the reasonable interpretations of the anatomic findings could be that Mr. Pheap had his back to Officer Williams and turned to look back toward Officer Williams as he fired his gun [Doc. 69-8, pgs. 28–29].

---

In *Davenport*, a male individual became violent during a traffic stop and, although he attempted to take the officer's taser at one point, he was shot by the officer as he was delivering multiple "closed-fisted blows" to another officer's head. *Id*. at 553. The individual's actions in *Davenport* were also recorded on video and, therefore, undisputed. Here, the Court cannot say with certainty what Mr. Pheap was doing at the moment Officer Williams drew his firearm and fired two rounds. He was either pointing the taser directly at Officer Williams or he was running away. Under either of these versions, he was not actively beating Officer Williams as the individual in *Davenport* was.

11

There is also testimony in the record from multiple eyewitnesses supporting Plaintiff's assertion that Mr. Pheap was running away from Officer Williams when he was shot. *See* [Doc. 69-2, pgs. 73, 95] (April Barnard testified that Mr. Pheap was running away, unarmed, with his back to Officer Williams); *see also* [Doc. 69-5, pgs. 94, 100] (Paulette Barnard testified that when Mr. Pheap was shot, he was not facing Officer Williams, he was running in the other direction, and he was about four parking spaces away); *see also* [Doc. 69-7, pg. 8, Expert Report of Roy G. Taylor, Ph.D.] (two other individuals, Patsy and Matthew Ellison, told investigators that Officer Williams shot Mr. Pheap as he was running away).[4] Finally, Plaintiff provided an expert opinion that Mr. Pheap could not have been holding the taser when he was shot if he was approximately 40 feet away (or four parking spaces) from Officer Williams. *See* [Doc. 69-7, pg. 11] ("By the time Mr. Pheap began to flee…Officer Williams's single-shot TASER had already been errantly deployed, its wires now dangling off Officer Williams's duty belt. By then, Mr. Pheap was approximately 40 feet away from Officer Williams, well beyond the 25-feet length of the TASER wires.").

Based on the foregoing and viewing the facts in the light most favorable to Plaintiff, there remain genuine issues of material fact regarding whether Mr. Pheap posed a threat of serious physical harm when he was shot and, thus, whether Officer Williams violated Mr. Pheap's Fourth Amendment rights by using deadly force. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir.1998) ("[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force.").

---

[4] Although, as mentioned previously, there are various contradictions in the eyewitness testimony, the Court may not weigh the evidence or make credibility determinations when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255.

## 2. Clearly Established

The Court's next task "is to determine whether the right at issue was clearly established on the date of the shooting." *Bouggess*, 482 F.3d at 894. If the answer is no, Officer Williams is entitled to qualified immunity, regardless of the alleged constitutional violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). For a constitutional right to be "'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). There need not be "a case directly on point, but existing precedent must have placed the…constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Additionally, the Supreme Court has advised lower courts "not to define clearly established law at a high level of generality." *Id*. at 742.

Officer Williams argues that the use of deadly force in the circumstances he was confronted with did not violate any clearly established right [Doc. 40, pg. 23]. However, Officer Williams, again, relies on his version of the facts. That is, he asserts:

> [A]s of August 26, 2019, it was [not] clearly established that it was unconstitutional for an officer to shoot twice when someone lunges at the officer, wrenches the officer's Taser from [ ] his grasp, and immediately aims the Taser at the officer and fires the Taser at him, all the while the officer is alone at the scene and where just seconds earlier he was engaged in a violent and rapidly unfolding struggle with the individual who repeatedly demonstrated a commitment to violently overpowering the officer.

[Doc. 40, pg. 23]. Bearing in mind that the Court must view the facts in the light most favorable to Plaintiff, the question here is whether it was clearly established, as of August 26, 2019, that it was constitutionally unreasonable for an officer to shoot an unarmed fleeing suspect who moments before was, at least, engaged in a physical struggle with the officer. Plaintiff asserts that "after *Garner*, no reasonable officer could think that the Fourth Amendment allows him to shoot an unarmed man who is running away." [Doc. 66, pg. 26]. However, the Supreme Court has "held

13

that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

The Court need not determine if the facts of the instant matter constitute an "obvious case" such that *Garner* would clearly establish the constitutional right at issue, because the Sixth Circuit, in *Bouggess v. Mattingly*, placed the constitutional question beyond debate on facts similar to this case. 482 F.3d at 895. In *Bouggess*, the officer approached an individual who he believed to have just committed a crime. *Id*. at 888. During his attempt to arrest the suspect, a struggle ensued. *Id*. at 888–89. As is the case here, the officer testified that he drew his weapon and that the suspect was trying to take it from him during the struggle, but this claim was contradicted by eyewitness accounts. *Id*. at 888 n.2. After the struggle, the suspect "broke free" and "ran directly away" from the officer. *Id*. at 889. The officer then fired at least three shots at the suspect, which, according to the medical examiner, struck the suspect in the back. *Id*. The suspect then fled around a corner, sat down, and died soon thereafter. *Id*. The Sixth Circuit held that, on these facts, this was "an obvious case" in which the officer "should be presumed to have been aware that [his] conduct violated constitutional standards." *Id*. at 895. Based on the foregoing, it was clearly established, as of August 26, 2019, that it was unconstitutional for an officer to shoot an unarmed fleeing suspect, despite the fact that the suspect had just engaged in a physical struggle with the officer.

Therefore, viewing the facts in the light most favorable to Plaintiff, genuine issues of material fact remain as to whether Officer Williams violated Mr. Pheap's clearly established Fourth Amendment rights, rendering summary judgment on the basis of qualified immunity improper. *See Bletz*, 641 F.3d at 749 ("[I]f genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is

improper."). In cases such as this, "the jury becomes the final arbiter of [the] claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989).

### B. Plaintiff's State Law Claims

In arguing for summary judgment on Plaintiff's state law claims of wrongful death, battery, and negligence, Officer Williams relies exclusively on the arguments he made above regarding Plaintiff's Section 1983 excessive force claim. The same issues of fact discussed above with respect to Plaintiff's excessive force claim also preclude summary judgment on Plaintiff's state law claims.

### IV. CONCLUSION

Accordingly, for the reasons stated herein, Officer Williams's Motion for Summary Judgment [Doc. 34] is **DENIED**.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge